# United States Court of Appeals for the Federal Circuit

04-5021, -5022

FIRST HEIGHTS BANK, FSB,
PULTE DIVERSIFIED COMPANIES, INC.,
and PULTE HOMES, INC.,

Plaintiffs-Cross Appellants,

v.

UNITED STATES,

Defendant-Appellant.

Robert K. Huffman, Miller and Chevalier Chartered, of Washington, DC, argued for plaintiffs-cross appellants.  With him on the brief were Alan I. Horowitz and Lisanne E.S. Cottington.

David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant.  With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General, Jeanne E. Davidson, Deputy Director, and Jeffery T. Infelise, Trial Attorney.

Appealed from:  United States Court of Federal Claims

Judge Eric Bruggink

# United States Court of Appeals for the Federal Circuit

04-5021, -5022


FIRST HEIGHTS BANK, FSB,
PULTE DIVERSIFIED COMPANIES, INC.,
and PULTE HOMES, INC.,

Plaintiffs-Cross Appellants,

v.

UNITED STATES,

Defendant-Appellant.

_____

DECIDED: August 17, 2005
_____

Before MICHEL, Chief Judge, NEWMAN, and LOURIE, Circuit Judges.

MICHEL, Chief Judge.

The United States appeals from the judgment of the United States Court of Federal Claims, awarding $48.7 million in damages to First Heights Bank, FSB, Pulte Diversified Companies, Inc., and Pulte Homes, Inc. (collectively, "plaintiffs"). The appeal was submitted after oral argument on July 6, 2005. Because the trial court properly determined liability and damages in this breach of contract action, we affirm.

**I**

This case is one of many arising out of the savings and loan crisis of the 1970s and 1980s. See United States v. Winstar Corp., 518 U.S. 839 (1996) (discussing the savings and loan crisis). At the heart of these "Winstar" cases are government actions

that were taken to induce otherwise healthy businesses and financial institutions to acquire troubled savings and loan associations ("thrifts").

This case is based on the "Assistance Agreement" involving two of the three plaintiffs and the government. The details of the Assistance Agreement and the negotiations leading up to it are explained in several of the trial court's opinions and will not be repeated here. See First Heights Bank, FSB v. United States, 51 Fed. Cl. 659 (2001); First Heights Bank, FSB v. United States, 53 Fed. Cl. 195 (2002); First Heights Bank, FSB v. United States, 57 Fed. Cl. 162 (2003). In short, after extended negotiations with representatives of the Federal Home Loan Bank Board and the Federal Savings and Loan Insurance Corporation ("FSLIC"), plaintiffs acquired five failing thrifts in exchange for various considerations detailed in the Assistance Agreement. A primary benefit of the Assistance Agreement from plaintiffs' perspective was the expected ability to claim the net liabilities of the failing thrifts as tax deductions, even if the net liabilities were offset by payments from the government ("reimbursed net liabilities").

Several years after plaintiffs acquired the failing thrifts, Congress enacted section 13224 of the Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, § 13224, 107 Stat. 312, 485-86, which is also known as the Guarini Amendment. The Guarini Amendment had the effect of disallowing the acquiring firms from claiming reimbursed net liabilities as tax deductions.

Plaintiffs brought suit in the Court of Federal Claims in 1996, alleging that the Guarini Amendment breached the Assistance Agreement. The trial court entered summary judgment in favor of plaintiffs, concluding, inter alia, that the Guarini

Amendment breached the implied covenant of good faith and fair dealing and awarding damages of $48.7 million in favor of plaintiffs. The government appeals the trial court's summary judgment as to liability and damages, and plaintiffs cross-appeal the trial court's rejection of its claim for lost profits. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## II

The facts of this case are closely connected to a subset of <u>Winstar</u> cases in which the primary allegation is that the Guarini Amendment breached agreements between the government and various private entities that acquired failing thrifts. The first case in which we considered this subset of <u>Winstar</u> cases was <u>Centex Corp. v. United States</u>, 395 F.3d 1283 (Fed. Cir. 2005). In that case, we concluded that prior to the Guarini Amendment the law allowed the acquiring firm to deduct reimbursed net liabilities. <u>Id.</u> at 1291-1304. We also concluded that the enactment of the Guarini Amendment breached the implied covenant of good faith and fair dealing by retroactively eliminating the ability to claim those deductions. <u>Id.</u> at 1304-11.

The liability issues in this case are largely governed by the decision in <u>Centex</u>. Because the briefing in this case closed before <u>Centex</u> was decided, the government's briefs contained many legal arguments that were rejected in <u>Centex</u>. To determine which arguments remained at issue after <u>Centex</u>, we issued an order before oral argument directing the parties to file supplemental briefing addressing the impact of <u>Centex</u> on this case. In its supplemental briefing, the government argued only that <u>Centex</u> was wrongly decided. Such an argument is misplaced because we must follow <u>Centex</u>, regardless whether we or the government think it was incorrectly decided.

Failing to distinguish <u>Centex</u> in its supplemental briefing, the government, nevertheless, raised two points during oral argument to explain why it cannot be held liable for damages.

The government first argues that damages cannot be awarded in this case because Pulte Homes, Inc. ("Pulte"), the parent corporation of Pulte Diversified Companies, Inc. ("PDCI"), is the only plaintiff that could be entitled to damages, but Pulte lacks standing to assert a claim for damages as it was not a party to the Assistance Agreement. In <u>Centex</u>, we rejected an indistinguishable contention that the parent corporation in that case, Centex Corporation, was the only party that could be entitled to damages but could not assert a damages claim. Specifically, we held:

> As a member of the Centex Consolidated Group, CTX [Centex's subsidiary] was eligible to share its tax benefits with the Group, and it was severally liable for the Group's tax liabilities. While it is true that CTX retained its status as a separate taxable entity, CTX was nonetheless a member of the Centex Consolidated Group that consented to the filing of a consolidated tax return. As a consequence, it enjoyed the benefits and was subject to the liabilities flowing from the consolidation of the tax accounts of the various affiliated entities. CTX was therefore in a position to benefit, through the reduction of the Consolidated Group's tax liability, from deductions that would reduce the Consolidated Group's taxable income. For that reason, CTX has a legal stake in the question whether the Consolidated Group was entitled to the tax benefits that were assertedly revoked by the Guarini amendment. We therefore reject the government's argument that neither [Centex nor CTX] has standing to sue for breach of contract.

<u>Centex</u>, 395 F.3d at 1291 (citations omitted).

Similarly in this case, Pulte and PDCI filed consolidated tax returns. PDCI, therefore, "enjoyed the benefits and was subject to the liabilities flowing from the consolidation of the tax accounts." <u>Id.</u> Because PDCI thus has standing to assert the damages claimed in this case, the first premise of the government's argument -- that

04-5021, -5022                                   4

Pulte is the only plaintiff that could be entitled to damages -- fails. Accordingly, we reject this argument that damages cannot be awarded.[1]

The government next contends that damages cannot be awarded because the Assistance Agreement in this case includes a provision, not at issue in Centex, that supplies the exclusive remedy for the breach, and plaintiffs cannot prove damages under that remedy. The provision to which the government refers is section 9(i) of the Assistance Agreement, which provides in pertinent part:

> Disallowed Deductions. In the event and to the extent Net Tax Benefits are credited to Special Reserve Account I or paid to the CORPORATION with respect to Tax Benefit Items that are subsequently disallowed or that are subsequently determined not to be excludible, or that cease to be Tax Benefit items because it is determined that payments with respect to such Tax Benefit Items are not to be excludible from gross income, such Net Tax Benefits shall be debited to Special Reserve Account I or, if this Agreement has terminated, paid to the PARENT ACQUIRING CORPORATION.

The effect of section 9(i) is to allow plaintiffs to seek reimbursement from the government of payments made to FSLIC related to deductions that were subsequently disallowed. Because plaintiffs did not make any such prepayments, the government argues that plaintiffs are not entitled to any damages.

We find the government's argument unpersuasive. Although reimbursement of prepayments on subsequently disallowed deductions is undoubtedly one remedy under the Assistance Agreement, there is no evidence that such reimbursement was intended to be the sole remedy. Indeed, section 25 of the Assistance Agreement provides to the

---

[1]  Because we reject the first premise of the government's argument, we need not reach its second premise -- that Pulte lacks standing to assert the damages claimed in this case -- including the contention that representations Pulte made during litigation in the United States District Court for the Eastern District of Michigan estop it from claiming to be a party to the contract here.

contrary. It states that "[t]he rights, powers, and remedies given to the parties by this Agreement shall be in addition to all rights, powers, and remedies given by any applicable statute or rule of law." Because that remedy is not exclusive, section 9(i) does not preclude plaintiffs from seeking damages other than mere reimbursement of such prepayments. Hence, we conclude that section 9(i) does not limit the remedies available to plaintiffs and, therefore, does not provide a basis for the government to avoid liability.

Accordingly, the government has failed to demonstrate that the trial court erred in holding it liable for breach of contract.

### III

The government also raises three arguments regarding the amount of damages awarded by the trial court. First, the government claims that $32.7 million in additional tax "charge-offs" should not be included in the damages calculation. The government bases its contention on what it describes as two alternative grounds. The first so-called alternative ground relates to mitigation. The government contends that there exists a genuine issue of material fact as to the reasonableness of plaintiffs' mitigation efforts because "nothing prevented plaintiffs from amending their tax returns to take advantage" of these charge-offs. In the government's view, because plaintiffs could have, but did not, accelerate the $32.7 million in additional charge-offs as deductions to the tax years preceding March 4, 1991, the effective date of the Guarini Amendment, plaintiffs should be barred from recovering damages based on those charge-offs.

The trial court rejected the government's mitigation argument after careful consideration of the facts. In 1993, plaintiffs amended their consolidated federal income

tax returns for 1989 and 1990 to lessen the impact of the Guarini Amendment by accelerating available charge-offs to pre-Guarini tax years. During this litigation, however, one of plaintiffs' experts, Linda McCall, determined after "extensive analysis and review" that "documentation errors" were made in the calculation that led to the previously accelerated charge-offs. These errors amount to an additional $32.7 million in tax charge-offs being asserted in this litigation. In rejecting the government's mitigation argument, the trial court held that "[a] party that attempted to mitigate should not be penalized for overlooking minor additional damage avoidance, particularly when, as in this case, further mitigation might cause the risk of IRS scrutiny and audit."

We agree with the trial court that the government has not raised a triable issue of fact as to the reasonableness of plaintiffs' mitigation efforts. The law requires that the non-breaching party make only "those efforts that are fair and reasonable under the circumstances." Home Sav. of Am., FSB v. United States, 399 F.3d 1341, 1353 (Fed. Cir. 2005) (internal quotation omitted). To support its mitigation argument, the government relies solely on its assertion that "nothing prevented" plaintiffs from taking the additional charge-offs prior to the effective date of the Guarini Amendment. The mere assertion that mitigation was possible, however, does not raise a triable issue of fact because it does not address the reasonability of the actions actually taken. Indeed, several facts strongly suggest that plaintiffs' mitigation efforts were reasonable. As emphasized by the trial court, the additional $32.7 million in charge-offs claimed in this litigation are minor as compared to the amount previously accelerated. Moreover, there is no evidence to suggest that the documentation errors associated with the $32.7 million in charge-offs were themselves unreasonable. On the contrary, the fact that

these errors were uncovered only after "extensive analysis and review" during litigation suggests that the errors were not so unreasonable as to constitute a failure to mitigate.

The government characterizes its second so-called alternative ground as one of causation, arguing that "if there were tax charge-offs that could have been taken by plaintiffs prior to the effective date of [the Guarini Amendment], but were not, any damages suffered by plaintiffs as a result of the loss of those charge-offs could not be attributed to the breach." The clear import of the government characterizing its argument as one of causation is to avoid the reasonability element of the mitigation doctrine. We disagree, however, with the causation label that the government assigns to its argument. The sole allegation underlying the government's argument is that plaintiffs failed to take actions that would have eliminated some of the damages from the breach. Such an allegation is covered by the mitigation doctrine and its reasonability element. We thus conclude that the government's so-called causation argument is identical to the government's mitigation argument and reject it for the reasons described above.

Second, the government contends that a genuine issue of fact exists as to the amount of the $32.7 million in additional charge-offs calculated by plaintiffs' expert, Ms. McCall. The government claims that Ms. McCall failed to establish the validity of the $32.7 million number because her calculation involved over 200 transactions, but she explained her rationale in detail for only two such transactions. Because the government has not identified any specific error with the expert's methodology or result, the government's assertion is too general to raise a genuine issue of material fact. We

04-5021, -5022                                    8

thus see no error in the district court accepting Ms. McCall's explanation for her calculation.

Third, the government makes a somewhat complicated argument about Ms. McCall's calculation of single return limitation year net operating losses ("SRLY NOLs"). We need not reach the details of this argument, however, because the conclusion that the government draws is that if the SRLY NOLs had been accurately calculated, "First Heights would have been able to utilize all of its SRLY NOLs before they expired" and, therefore, plaintiffs failed to mitigate damages. This argument fails for the same reason that the mitigation argument as to the $32.7 million in charge-offs fails, that is, the government's argument addresses only the possibility of mitigation, not the reasonability of the actions actually taken. As stated by the trial court, the SRLY NOLs arguments made by the government's expert "merely reflect his view of how plaintiffs should have conducted their affairs. He has not presented any proof that plaintiffs, in fact, unreasonably or illegally conducted their affairs."[2] First Heights Bank, 57 Fed. Cl. at 172.

Accordingly, the government has not demonstrated that the trial court erred in the amount of its damages award.

---

[2] The government also contends that the trial court abused its discretion in finding that the government's expert's "criticisms cannot be taken into account." First Heights Bank, 57 Fed. Cl. at 172. The government argues that the trial court effectively excluded the expert's testimony and erred in doing so because the identification of a means for mitigation is relevant to the mitigation issue. This contention misreads the context of the trial court's statement. The trial court did not exclude the expert's testimony on relevancy grounds but instead carefully considered the opinion and determined that the criticisms raised by Mr. Wolf were insufficient to raise a triable issue of fact.

**IV**

Plaintiffs cross-appeal the trial court's denial of lost profits as damages. Plaintiffs assert that Pulte would have reinvested into its homebuilding business the money it would have received in tax benefits had the government not breached the Assistance Agreement. Plaintiffs also claim that the government was made aware of their intention to reinvest during the negotiations of the Assistance Agreement. According to plaintiffs, the government was made aware of three facts: (1) that Pulte was involved in homebuilding, (2) that Pulte had been profitable for 32 years in a row, and (3) that the tax benefit sharing provision would provide benefits only if Pulte remained profitable.

In Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012 (Fed. Cir. 1996), we set forth the following requirement for determining entitlement to lost profits:

> If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement. . . . But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.

Id. at 1022-23 (internal quotation omitted; alteration in original). Applying that standard, we rejected a claim by Wells Fargo to recover not only the amount due on its loan to a developer named High Plains that was guaranteed by the government but also the profits the bank might have earned by reinvesting that money into its banking business. We reasoned that "Wells Fargo's loss of interest on additional loans it allegedly could have made had there been no breach [was] too uncertain and remote" in part because "the purpose of the guarantee was to enable Wells Fargo to make profits from the

interest on its loan to High Plains, not on some other loans it might make." Id. at 1023 (internal quotation omitted).

In this case, the trial court held "that the subject of the bargain was confined to the opportunity to take advantage of the tax laws; that it would not have been forseeable to federal negotiators that plaintiffs were entering into the arrangement to secure future funds for homebuilding projects." First Heights Bank, 57 Fed. Cl. at 174. We agree that whatever additional profits plaintiffs might have earned on whatever additional projects might have been undertaken had the government not breached the Assistance Agreement are too remote to be compensable. Although the government was aware of background information about Pulte being a profitable homebuilder, no specific reference was made during negotiations to homebuilding projects for which the tax benefits were to be used. Nor did the Assistance Agreement inherently refer to the alleged additional homebuilding projects. The subject of the contract in this case was simply money. Plaintiffs could have used the money in any number of ways, including, but not limited to, funding additional homebuilding projects. Accordingly, we conclude that the lost profits plaintiffs seek are not "such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment" and, therefore, cannot be awarded. Wells Fargo, 88 F.3d at 1023.

**V**

In sum, we conclude that PDCI has standing to assert the damages claimed in this case, section 9(i) of the Assistance Agreement does not provide the exclusive remedy for a breach of the kind asserted in this case, plaintiffs reasonably mitigated damages, the trial court properly considered plaintiffs' expert testimony on the amount of damages, and plaintiffs are not entitled to lost profit damages. Accordingly, the judgment of the trial court is affirmed.

<u>AFFIRMED</u>