**LOCAL AMERICA BANK OF
TULSA, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 96–584C.**

United States Court of Federal Claims.

March 27, 2002.

Melvin C. Garbow, Washington, D.C., for plaintiff Local Oklahoma Bank. With him on the briefs were Kent A. Yalowitz, Howard N. Cayne, Thomas R. Dwyer, Robert J. Jones, Andrew T. Karron, Michael A. Johnson, and Ida L. Bostian, all of counsel.

Paul G. Freeborne, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for the United States. With him on the briefs were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Scott D. Austin, Glenn I. Chernigoff, Jeffrey T. Infelise, Brian A. Mizoguchi, and Brian L. Owlsey, all of counsel.

## OPINION

BRUGGINK, Judge.

Pending in this *Winstar*-related [1] case are plaintiff Local Oklahoma Bank's ("Local's") [2] Motion for Summary Judgment on Liability and defendant United States' Cross–Motion for Summary Judgment, Motion to Dismiss, and Opposition to Plaintiffs' Motion for Summary Judgment. Oral argument is deemed unnecessary. For the reasons set out below,

---

1. *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

2. The original complaint named as plaintiffs Local America Bank of Tulsa, Local America, Inc., and Local Federal Bank, FSB. On November 30, 1998, Local America Bank of Tulsa merged with Local Federal Bank. At this time, Local America,

Inc. was liquidated and ceased to exist. On April 1, 1999, Local Federal Bank, FSB changed its name to Local Oklahoma Bank. Local Oklahoma Bank is now the sole plaintiff. We will refer to any of the above-named institutions simply as "Local."

Local's motion is granted and the government's motions are denied.

## BACKGROUND

This is one of a series of "tax benefit" cases arising from efforts made by the Federal Savings and Loan Insurance Corporation ("FSLIC") and the Federal Home Loan Bank Board ("FHLBB"), against the backdrop of the savings and loan crisis of the 1980s, to avoid some of the costs associated with liquidating failing savings and loan institutions ("thrifts"). These efforts included assisting the plaintiffs in these cases, which were healthy (or at least healthier) institutions, to acquire these failing thrifts.

Local and the other such plaintiff banks contracted with FSLIC and FHLBB to take over certain thrifts in return for assistance, including reimbursement for losses sustained upon disposal of the failing thrifts' "covered assets."[3] Under FSLIC-specific provisions existing in the Internal Revenue Code ("IRC") at the time, FSLIC's reimbursement of covered asset losses was not included in gross income. As we held in *Centex Corp. v. United States ("Centex I")*, 48 Fed.Cl. 625, 632–37 (2001), the IRC also allowed a tax deduction for covered asset losses even though FSLIC reimbursed those losses with tax-free assistance. The plaintiffs claim that Congress's enactment of § 13224 of the Omnibus Budget Reconciliation Act of 1993 (the "Guarini legislation"), which eliminated the covered asset loss deduction, constituted a breach of contract for which the government is liable for money damages.

In our second opinion in *Centex ("Centex II")*, we determined that, "[t]hroughout the 1980s, the FSLIC and the FHLBB repeatedly explained to Congress that the FSLIC-specific tax provisions of the Internal Revenue Code reduced the costs to the FSLIC and the FHLBB of selling insolvent thrifts." 49 Fed.Cl. 691, 693 (2001) (citing *Expiring Tax Provisions: Hearing Before the Subcomm. on Taxation and Debt Management*

*of the S. Comm. on Fin.*, 100th Cong. 15 (1988) (statement of Lawrence J. White); *Carryover of Net Operating Losses and Other Tax Attributes of Corporations: Hearing Before the Subcomm. on Select Revenue Measures of the House Comm. on Ways and Means*, 99th Cong. 173–77 (1985); Letter from FHLBB Members to Senator Garn (Feb. 14, 1986); FHLBB Annual Report 18 (1986)). We further found that the "tax benefits flowing from the FSLIC-specific tax provisions were, in effect, additional assets that the FSLIC and the FHLBB could market when approaching potential acquirers. . . . in and around 1988, tax experts concluded that one of these tax benefits was a deduction for covered asset losses." *Id.* at 693.

Although these tax benefits were set to expire at the end of 1988, Congress, at FHLBB's urging, enacted the Technical and Miscellaneous Revenue Act of 1988, Pub.L. No. 100–647, 102 Stat. 3342 ("TAMRA"). TAMRA extended the sunset of the FSLIC-specific tax provisions to December 31, 1989, but cut by fifty percent any tax benefits for FSLIC-assisted acquisitions occurring after December 31, 1988.

Seeking to take advantage of the law as it existed in 1988, FHLBB devised the "Oklahoma Consolidation and Integration Plan," under which fourteen insolvent thrifts were packaged into "market areas" and let out for bids. FHLBB Recommendation Memo. (Aug. 30, 1988) at 1. The plan's "Market Area # 2" included two Tulsa, Oklahoma institutions: First Oklahoma Federal Savings Bank ("First Oklahoma") and MidAmerica Federal Savings and Loan Association ("MidAmerica"). *Id.* at 5. Packaged together, the two thrifts had assets of $526.06 million, regulatory capital of negative $32.30 million, and tangible capital of negative $38.52 million. *Id.* FHLBB placed the two thrifts into receivership, combined them, and renamed them Community Federal Savings and Loan

---

**3.** The Assistance Agreement in this case, at § 1(m), in pertinent part, defines "covered asset" as "[e]ach asset owned by the ACQUIRING ASSOCIATION." At § 1(n), it defines "covered asset loss" as the "amount . . . (i) by which the Book Value of a Covered Asset exceeds the Net Proceeds [r]eceived by the ACQUIRING ASSOCIATION upon the Liquidation of such Covered Asset, or (ii) of any write-down in Book Value of a Covered Asset approved by the CORPORATION pursuant to § 4."

186

Association ("Community Federal"). *Id.* at 9.

On September 1, 1988, officials from FSLIC and Federal Home Loan Bank of Topeka hosted a meeting for potential purchasers in order to invite proposals to acquire Community Federal and several other consolidations. Steptoe & Johnson Rpt. to the Oversight Brd. of the Resolution Trust Corp. ("RTC") and The Congress on the 1988/89 FSLIC Assis. Agreements, Vol. II, App. H. ("Steptoe & Johnson Rpt.") (Dec. 26, 1990) at 4. At the meeting, FHLBB distributed a document entitled "Information and Instructions For the Preparation and Submission of Proposals For the Acquisition of: Community Federal Savings and Loan Association Tulsa, Oklahoma" (the "RFP").

The "Tax Benefits" section of the RFP stated the following:

In general, the Internal Revenue Code of 1986 *presently* contains three provisions that provide favorable Federal income tax consequences to a taxpayer that acquires a savings and loan institution in an FSLIC-assisted transaction. First, most FSLIC-assisted acquisitions will qualify as a tax-free reorganization under section 368(*l*)(1)(G) of the Code. Because of this the tax basis of the assets of the acquired Institution will carry over to the acquiror and permit the acquiror to recognize a tax loss upon the disposition of an acquired asset which has a tax basis greater than its fair market value. Second, if the transaction qualifies as a tax-free reorganization, section 382 of the Code generally will permit any net operating loss carryover of the acquired institution to be utilized by the acquiring institution to offset post-acquisition taxable income. Third, section 597 of the Code provides that FSLIC assistance payments received by a savings and loan institution are not includable in income and do not require a reduction in the basis of other assets. These consequences often occur under state income tax laws as well.

*These provisions have the effect of permitting an acquiring institution to realize tax benefits attributable to a particular item even though FSLIC assistance is received with respect to such item. For example, if the acquiror receives coverage for capital losses incurred on the disposition of identified assets of the acquired institution, the acquiror is entitled to deduct such loss for federal income tax purposes, notwithstanding that it is reimbursed for the loss by the FSLIC, and that the FSLIC payment is tax free. Similarly, if payments are made by the FSLIC to an acquiror pursuant to a yield guarantee, such assistance need not be reported as taxable income by the acquiror.*

These provisions were intended to aid the FSLIC by reducing the amount of FSLIC assistance that should be required by an acquiring institution for a particular cost, expense or loss by the amount of the tax benefit obtained by the acquiring institution with respect to such cost, expense or loss. This reduction in required assistance can be realized by the FSLIC in one of two ways: (1) Assistance amounts to be paid by FSLIC to the acquiring institution can be reduced by the amount of the tax benefit available to the acquiring institution with respect to the item for which assistance is being paid. For example, if capital loss coverage is requested, and the combined marginal federal and state income tax rate is 40%, FSLIC can pay 60% of any loss or liability incurred and the acquiring institution can recover the remaining 40% of the loss through a deduction for the loss on its tax returns. (2) Assistance amounts can be paid in full by FSLIC to the acquiring institution and the acquiring institution can return to FSLIC the allocable tax benefit when it is realized by the filing of income tax returns. Thus, under this method in the above example, FSLIC will pay 100% of the loss or liability and the acquiring institution will pay the tax benefit to FSLIC when the tax returns recognizing such benefit are filed. In taking account of tax benefits, FSLIC prefers to use method (1) but will consider method (2).

RFP at 7–8 (emphasis added) (paragraph numbers omitted).

As we noted in *Centex II*, which involved a similar RFP:

The tax-free character of the reorganization, the ability to carryover net operating losses, and the opportunity to take the covered asset loss deduction were thus all identified [in the RFP] by the FSLIC as tax benefits available in a late–1988 FSLIC-assisted acquisition of failing thrifts.... As indicated in [the RFP], the covered asset loss deduction allowed acquirers to recognize a tax loss, even where there was no economic loss due to the tax-free assistance received from the FSLIC on covered asset losses.

49 Fed.Cl. at 694–95.

On October 13, 1988, Local's CEO, Edward Townsend, submitted a memorandum to Local's Board of directors proposing to acquire Community Federal. Memo. from Townsend to Brd. of Dirs. (Oct. 13, 1998) at 3. In the memorandum, Townsend noted that the "tax benefit of this transaction has tremendously positive profit implications for our company," *id.*, which was experiencing financial problems at the time. *Id.* at 1. On October 17, 1988, he presented Local's Board of Directors with a proposed term sheet for the acquisition of Community and sought authorization to submit the bid to the government. Minutes of Local's Brd. of Dirs. ("Brd. Minutes") (Oct. 17, 1988) at 1–2.

Section 7 of the term sheet, entitled "Tax benefits," proposed that Local offer FSLIC one of two alternatives in exchange for acquiring Community Federal:

*Alternative A*

FSLIC will receive 50% of the tax benefit of any acquired net operating loss carryforwards realized in cash; Acquirer will pay FSLIC the tax benefits of current assistance payments based on net income of Acquired Institution ... times the effective federal and state income tax rates, times 50%. This agreement will be in effect for 5 years, and in no case will exceed 19% of net income as defined

*Alternative B*

The Acquiring Institution will accept a rate on the initial FSLIC capital contribution note and the yield rate on covered assets equal to 25 basis points less than those rates stated in the terms of this proposal

in exchange for receiving all tax benefits of this acquisition

Local Presentation to Brd. of Dirs. of a Proposed Acquisition, Term Sheet (Oct. 17, 1988) at 3. In its "Indemnifications" section, the term sheet also stated that "[t]his transaction is structured on the basis of current tax statutes and regulations and any subsequent changes which adversely impact the economics of this transaction will be reimbursed by the FSLIC." *Id.* at 7.

Local's Board authorized Mr. Townsend to submit this proposal to FSLIC. Brd. Minutes (Oct. 17, 1988) at 2. Local submitted its formal proposal to FSLIC on October 25, 1988, thus becoming a bidder for Community Federal. Steptoe & Johnson Rpt. (Dec. 26, 1990) at 5; Issues Memo. from Stuart D. Root, Executive Director, FSLIC, to FHLBB ("Issues Memo") (undated) at 3–7. In the "Tax benefits" section of the formal proposal, Local again offered the alternatives mentioned above. Local Presentation to FSLIC of a Proposed Acquisition, Term Sheet (Oct. 25, 1988) at 3.

On November 30, 1988, at FSLIC's request, Local modified its bid. It removed the tax benefit cap of nineteen percent income, but otherwise offered the same alternatives with regard to tax benefits as before. Amended Presentation to FSLIC of a Proposed Assisted Acquisition (Nov. 30, 1988) at 6. Local again requested indemnification from FSLIC for several contingencies, including "any change in the federal tax laws or regulations after the date of this proposal which reduces the tax benefits arising from the Acquisition." *Id.* at 5.

Following this submission, the parties continued to negotiate. During these negotiations, government analysts observed that Local's bid committed it to "pay to the FSLIC 50% of the savings resulting from the tax exempt-benefit nature of the assistance package." FHLBB Corp. & Sec. Div. Legal Op. (Dec. 27, 1988) at 2. Local's final bid proved to be the most advantageous to the government; accordingly, government analysts recommended that FHLBB contract with Local.

On December 29, 1988, the parties executed an Assistance Agreement (the "Agree-

ment") and a Tax Certification. The provisions dealing with the covered asset loss deduction are virtually identical to the covered asset loss provisions in *Centex:*

Section 3 of Local's Agreement:

§ 3 *Special Reserve Account.* [Local] shall establish, as of the Effective Date, two memorandum accounts, to be called Special Reserve Accounts I and II and shall maintain such accounts solely for the purpose of, and in accordance with, the provisions of this Agreement.

The initial balance in the Special Reserve Accounts I and II respectively shall be zero. The balances in the Special Reserve Accounts I and II as defined in the Assistance Agreement by and among the ACQUIRED ASSOCIATION and [FSLIC] dated August 31, 1988, ("Former SRA's") shall be paid to [Local] in cash as of the Effective Date and the Former SRA's are terminated as of that date.

(a) *Debits to the Special Reserve Account I.* [Local] may, following the Effective Date, charge as Debits to Special Reserve Account I amounts equal to each of the following items:

(1) *Capital Losses on Covered Assets.* The amount of Covered Asset Losses . . . .

Section 9 of Local's Agreement:

§ 9 *Tax Benefits.* For each taxable year of [Local] that closes after the Effective Date, [Local] shall credit to Special Reserve Account I or, if this Agreement has terminated, pay to [FSLIC] an amount equal to the sum of the Federal Net Tax Benefits (as defined and calculated in accordance with § 9(b)) and the State Net Tax Benefits (as defined and calculated in accordance with § 9(c)), if any, realized by [Local] in any year (collectively "Net Tax Benefits").

(a) *Tax Benefit Items.* For purposes of this Agreement, the Net Tax Benefits shall be the tax benefits that are attributable to the items described in § 9(a)(1), (2), (3) and (4)[ ] below ("Tax Benefit Items") and that are either utilized by [Local] to reduce its Federal or state income tax liability in a given tax year, as calculated in § 9(b) and (c) below, or are excluded from Federal or state income in a given tax year:

. . . .

(2) 50% of any cost, expense or loss (i) which is incurred by [Local], (ii) for which [FSLIC] has made assistance payments to [Local] pursuant to § 3(a)(1), (4) and (6) of this Agreement, and (iii) which is deductible on [Local's] Federal or state income tax return or reduces the balance of [Local's] bad debt reserve . . . .

Section 9(a)(2) of Local's Agreement designates as a tax benefit "50% of any cost, expense or loss ... which is incurred by [Local] ... for which [FSLIC] has made assistance payments to [Local] pursuant to ... this Agreement"—i.e., it designated covered asset losses as a tax benefit. Section 3(a)(1) of the Agreement provides that Local can charge covered asset losses as debits to Special Reserve Account I—i.e., Local was entitled to FSLIC-assisted reimbursement of covered asset losses. Thus, under Sections 9(a)(2) and 3(a)(1), covered asset losses are a tax benefit item to be shared equally between Local and the government. These sections are more or less identical to Sections 9(a)(2) and 3(a)(1) of the Centex agreement.

Section 7 of the Agreement, entitled "Indemnifications and Pursuit of Related Claims," did not contain a provision requiring FSLIC to indemnify Local for any change in federal tax laws or regulations reducing the tax benefits arising from the Agreement.

Like the Centex agreement, Local's Agreement contained an integration clause—section 27—establishing that the Agreement and other written agreements between Local and the government constituted the entire agreement between the parties. As we found in *Centex I,* section 9 of Local's Agreement with the government contains no promise that the covered asset loss deduction would continue to be available. 48 Fed.Cl. at 630. In any event, such a promise would have been unauthorized. *Id.* at 632.

Several documents created by Local before and after the transaction evidence Local's understanding that the covered asset loss tax benefit would exist for the Agreement's duration. For instance, a business plan submitted by Local to the government on December 23, 1988, demonstrates that Local counted on

paying definite amounts of tax benefits to FSLIC for five years—i.e., until 1993. Local Bus. Plan for Proposed FSLIC–Assisted Acquisition of Community Fed. (Dec. 23, 1988) at 79. A "Form 8–K" submitted by Local on December 29, 1988, states that "Local Federal will share in the tax benefits of the covered asset losses and tax-free nature of the FSLIC assistance on a 50–50 basis." FHLBB Form 8–K (Dec. 29, 1988) at 5. Local's financial statement for 1989 stated that "Local Federal will share in the realized tax benefits of the covered asset losses and tax-free nature of the FSLIC assistance on a 50–50 basis." Local America Fin. Stments. (June 30, 1989) at 5.

The government's documents, in turn, evidence its understanding that the covered asset loss tax benefit would exist for the life of the Agreement. The RTC Report's analysis of the Local transaction shows "FSLIC/FRF"s Percentage Share of Tax Benefits Items" with regard to "Capital Losses" as fifty percent for each year from 1988–98. RTC Rpt., Vol. 5 (App. Relating to Local's Acquisition of Community Fed.), Ex. II (Aug. 21, 1990). The report notes that "[t]ax benefits realized from reimbursement of covered asset purchases and accrued but uncollected interest and late charges ... are subject to 50.0% sharing whereas tax benefits from other expenses are paid 100.0% to FSLIC." *Id.* A FHLBB "Fact Sheet" states that "FSLIC and Local America will share 50–50 in the tax benefits of built-in losses." FHLBB "Fact Sheet" (undated). A FDIC Division of FSLIC Operations "Fact Sheet" states that the "FSLIC Resolution Fund receives 50% of tax benefits attributable to interest payments on notes, guaranteed yield payments and capital loss reimbursements." FDIC Div. of FSLIC Operations Fact Sheet (Sept.1989) at 37.

Section 31 of the Agreement includes a "continuing cooperation" or "best efforts" clause, which states that "[t]he parties ... agree that they shall in good faith, and with their best efforts, cooperate with one another to carry out the purposes of this Agreement as described in this section."

Finally, FHLBB provided Local with a "Tax Certification" which, according to Local,

unlocked the covered asset loss deduction and the other tax benefits available to it as a result of its acquisition of Community Federal. FHLBB Res. 88–1480P (Dec. 29, 1988) at 13–14; Letter from John F. Ghizzoni, Assistant Secretary, FHLBB, to Local Brd. of Dirs. (Dec. 29, 1988); Memo. from Jordan Luke, General Counsel, FHLBB, to Chairman Wall and Brd. Mbrs. White and Martin, FHLBB (Dec. 29, 1988) at 7.

Following the consummation of the parties' Agreement, the government began to reconsider its position with regard to granting covered asset loss deductions to institutions in exchange for their acquisition of failing thrifts. We discussed, in detail, the government's change of heart in *Centex II*. Because *Centex* involved the same background facts as included in this record, we incorporate those findings by reference. *See* 49 Fed.Cl. at 699–707. In sum, they establish that the government enacted the Guarini legislation in order to target and eliminate the covered asset deduction it had held out to plaintiffs like Local as an incentive to acquire failing thrifts.

### DISCUSSION

Local argues that, by enacting the Guarini legislation, the government eliminated the Agreement's tax benefits in a way that it breached an implied covenant of good faith and fair dealing, breached an express promise to use its "best efforts" to assure plaintiffs of the benefits of their bargain, breached representations and warranties it made to Local to induce it to acquire Community Federal, and which constitutes a Fifth Amendment taking and a violation of the Due Process Clause of the Constitution.

■ We held on virtually identical facts in *Centex II* that the government had indeed violated an implied promise of good faith and fair dealing when, after inducing Centex to enter into a contract taking over several defunct banks in part by advertising the availability of a covered asset loss tax deduction, Congress targeted this same deduction for retroactive repeal. We hold that the government violated an identical promise in

this case.[4] It is unnecessary to consider other theories of liability plaintiff advances, which we understand to be in the alternative, nor is it necessary to revisit the government's contention that our previous "tax benefit" rulings—*Centex, First Nationwide Bank v. United States,* 49 Fed.Cl. 750 (2001), and *First Heights Bank, FSB v. United States,* 51 Fed.Cl. 659 (2001)—are irreconcilable with *Winstar* or *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982). We have considered that and other defenses and, for reasons explained in *Centex II,* reject them.

The government seeks to distinguish this case from *Centex II,* in which we determined that, absent a finding of breach of the implied covenant of good faith and fair dealing, the parties' "extensive negotiations concerning the allocation of tax benefits would have led to a useless, unenforceable agreement." 49 Fed.Cl. at 709. This case, the government argues, is different because Local was primarily seeking to gain advantages from the Community Federal acquisition other than the tax benefits. Thus, it alleges, the negotiations here led to a fruitful agreement despite the withdrawal of the tax benefits and, accordingly, Local's allegations of a breach of the implied covenant must fail.

The government seeks to bolster this argument by contending that, facing financial problems, Local was willing to assume the risk that the tax benefits advertised by the government would exist long enough for it to take advantage of them and thereby correct any financial problems it had. According to the government, the tax benefits were incidental to the deal in light of the other benefits of the acquisition of Community Federal, such as the opportunity to gain a presence in Tulsa, Oklahoma, a condition which Local's management felt was crucial to its profitability. *See* Memo. from Townsend to Brd. of Dirs. (Oct. 13, 1998) at 1–2; Dep. of Edward Townsend at 22–23, 45, 49. This is obvious, the government asserts, because Local did not insist on a provision in the Agreement requiring the government to indemnify it for any change in the IRC.

As in *Centex,* however, the facts leading to the Agreement are clear. Both Local and the government understood that the covered asset loss deduction was available and that this incentive contributed to make the contract desirable to Local. Government negotiators understood this and constructed the Agreement to take advantage of the benefits for the United States. The fact that there may have been other benefits to Local is immaterial. Each party is entitled to rely on all components of the deal it negotiated. It is not incumbent on the government to dictate which parts of the agreement were important to the other side. The fact that there is no indemnification clause requiring the government to indemnify Local for any change in the IRC retracting the tax benefits in question is also immaterial. The court has not held that the government's breach triggered a duty of indemnification. If the court is correct that the parties contracted for a division of tax benefits, and those benefits were improperly eliminated, then there is an independent breach of the duty of good faith and fair dealing. The indemnification clause would be both superfluous and somewhat ironic if intended for these circumstances as opposed to a failure due to a general change in the tax laws, for example.

The government negotiated the Agreement, waited until after Local acquired Community Federal in reliance on it, and then promptly utilized its unique sovereign powers to retract the covered asset loss deduction. To that extent, the understanding was unilaterally revised.

 It is elementary that "every contract has an implied condition that 'neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance.'" *Petrofsky v. United States,* 222 Ct.Cl. 450, 616 F.2d 494, 497 (1980) (quoting *Petrofsky v. United States,* 203 Ct. Cl. 347, 488 F.2d 1394, 1404 (1973)). When the government is one of the parties, it "im-

---

4. Thus, neither an express promise locking in the covered asset loss deduction nor the authority to make that promise are necessary to Local's claim because the implied covenant of good faith and fair dealing serves to protect its expectations regarding the tax benefits.

pliedly promises to act in good faith and 'invoke its great power of a sovereign act when and only when and to the extent necessary to carry out its essential governmental functions.' " *Hughes Communications Galaxy, Inc. v. United States,* 26 Cl.Ct. 123, 140 (1992) (quoting *Air Terminal Servs., Inc. v. United States,* 165 Ct.Cl. 525, 330 F.2d 974, 981 (1964) (Jones, C.J., dissenting)), *rev'd on other grounds,* 998 F.2d 953 (Fed.Cir.1993). Here, the government invoked its sovereign power to take away the benefit of the bargain it made with Local, thus breaching its implied promise to act in good faith.

Because the implied covenant demands enforcement of the spirit of the bargain, we may look beyond the fact that the Agreement does not expressly guarantee the covered asset loss deduction over the course of its life. The documents evidencing the course of dealing between the parties demonstrate the importance they placed on tax benefits.[5] They were central to how the contract was structured. Memo. from Townsend to Brd. of Dirs. (Oct. 13, 1998) at 3 ("The tax benefit of this transaction has tremendously positive profit implications for our company ...."); Local Presentation to Brd. of Dirs. of a Proposed Acquisition, Term Sheet (Oct. 17, 1988) at 3 (containing a term sheet with a "Tax benefits" section setting forth potential tax benefits proposals to include in the Agreement); Local Presentation to FSLIC of a Proposed Acquisition, Term Sheet (Oct. 25, 1988) at 3 (same); Amended Presentation to FSLIC of a Proposed Assisted Acquisition (Nov. 30, 1988) at 6 (same); Local Bus. Plan for Proposed FSLIC–Assisted Acquisition of Community Fed. (Dec. 23, 1988) at 79 (demonstrating that Local counted on paying definite amounts of tax benefits to FSLIC for the five-year life of the Agreement); FHLBB Form 8–K (Dec. 29, 1988) at 5 ("Local Federal will share in the tax benefits of the covered asset losses and tax-free nature of the FSLIC assistance on a 50–50 basis.");

Local America Fin. Stments. (June 30, 1989) at 5 ("Local Federal will share in the realized tax benefits of the covered asset losses and tax-free nature of the FSLIC assistance on a 50–50 basis."); FHLBB Corp. & Sec. Div. Legal Op. (Dec. 27, 1988) at 2 (noting that Local's bid committed it to "pay to the FSLIC 50% of the savings resulting from the tax exempt-benefit nature of the assistance package."); RTC Rpt., Vol. 5 (App. Relating to Local's Acquisition of Community Fed.), Ex. II (Aug. 21, 1990) (showing "FSLIC/ FRF"s Percentage Share of Tax Benefits Items" with regard to "Capital Losses" to be fifty percent for each year from 1988–98 and noting that "[t]ax benefits realized from reimbursement of covered asset purchases and accrued but uncollected interest and late charges ... are subject to 50.0% sharing whereas tax benefits from other expenses are paid 100.0% to FSLIC."); FHLBB "Fact Sheet" (undated) ("FSLIC and Local America will share 50–50 in the tax benefits of built-in losses."); FDIC Div. of FSLIC Operations Fact Sheet (Sept.1989) at 37 ("FSLIC Resolution Fund receives 50% of tax benefits attributable to interest payments on notes, guaranteed yield payments and capital loss reimbursements ....").

Furthermore, the FHLBB tax certificate integrated into the contract (through section 27 of the Agreement, which incorporates into the Agreement "any resolutions or letters concerning the PREVIOUS TRANSACTION or this Transaction or this Agreement issued by the Bank Board") also indicates the parties' recognition of the importance of the tax benefits to the contract. FHLBB Res. 88–1480P (Dec. 29, 1988) at 13–14. Presumably, there would be no reason for the parties to include this tax certificate, which mentions "tax advantages," unless tax benefits were assumed.

Thus, Local's expectation—i.e., the "spirit of the bargain"—was that it would be eligible

---

5. *See Sylvania Elec. Prods., Inc. v. United States,* 198 Ct.Cl. 106, 458 F.2d 994, 1005 (1972):

[M]eaning can usually be given to a writing only on consideration of all the circumstances, including the prior negotiations between the parties. The parol evidence rule is therefore no bar to the use of the oral statements of the parties during negotiations, in aid of the inter-

pretation of ambiguous or uncertain clauses in written agreements. Expressions of the parties during negotiations for the contract are thus a frequent source for interpretation of its text.

(Citing RESTATEMENT OF CONTRACTS §§ 238, 230, 231 (1932); 3 CORBIN, CONTRACTS, §§ 543, 579 (1960)) (citations omitted).

to take advantage of the tax benefits over the entire duration of the Agreement without the government subsequently legislating for its own pecuniary interest. The government offers no plausible argument that this expectation was not a legitimate fruit of the contract. By enacting targeted tax legislation to frustrate this benefit to Local, the government compromised Local's right to receive this benefit, thus breaching the covenant of good faith and fair dealing implicit in the bargain.

## CONCLUSION

Local's motion for summary judgment is granted. The government's cross-motion for summary judgment and motion to dismiss are denied. The parties are directed to consult to prepare, jointly if possible, a schedule for determining damages. The schedule(s) shall be included in a joint status report to be filed on or before April 24.