**TEMPLE–INLAND INC. and Subsidiaries, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 99–699C.

United States Court of Federal Claims.

Nov. 8, 2005.

John H. Fleming, Atlanta, Georgia, for plaintiffs Temple–Inland Inc. and Subsidiaries. With him on the briefs were Daniel R. McKeithen and Jennifer N. Ide, Atlanta, Georgia, of counsel.

Brian A. Mizoguchi, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for the

United States. With him on the briefs were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Scott D. Austin, Jeffrey T. Infelise, and Brian L. Owsley, of counsel.

## OPINION

BRUGGINK, Judge.

In response to the savings and loan crisis of the 1980s, Congress sought ways to induce outside investors to acquire failing thrifts and restore them to financial viability. It authorized the Federal Savings and Loan Insurance Corporation ("FSLIC") and the Federal Home Loan Bank Board ("FHLBB") to provide acquirers with financial assistance to protect against losses created by such acquisitions. This assistance was not included in an acquirer's taxable income.

This case is one of several arising out of Congress's subsequent enactment of Section 13224 of the Omnibus Budget Reconciliation Act of 1993 ("Guarini legislation," "Guarini," or "Section 13224"), which eliminated the tax benefits associated with the acquisition agreements. Pub.L. No. 103–66, 107 Stat. 312, 485 (1993). It accomplished this by requiring that FSLIC assistance with respect to any loss or write-down of assets had to be taken into account in computing the amount of the taxable loss or charge-off resulting from disposition or write-down of a Covered Asset.

We have held previously that Congress's enactment of the Guarini legislation breached some of the acquisition agreements. *See, e.g., First Heights Bank v. United States,* 57 Fed.Cl. 162 (2003); *Centex Corp. v. United States,* 55 Fed.Cl. 381 (2003), *aff'd* 395 F.3d 1283 (Fed.Cir.2005); *Nat'l Austl. Bank v. United States,* 55 Fed.Cl. 782 (2003); *Coast-to-Coast Fin. Corp. v. United States,* 51 Fed. Cl. 358 (2002); *Local Am. Bank,* 52 Fed.Cl. 184 (2002). Similarly, in this particular litigation, we concluded that the government was liable for breaching the contract by which plaintiffs, Temple–Inland Inc. ("Temple") and its subsidiary, Guaranty Federal Savings Bank ("GFSB") (referred to collectively as "TIN") acquired a group of defunct savings and loan associations. *Temple–Inland, Inc. v. United States,* 59 Fed.Cl. 550 (2004).

We now consider TIN's motion for partial summary judgment as to a portion of its damages. TIN seeks an adjudication that it lost a total of $555,791,213 in Covered Asset Loss ("CAL") deductions, which have led to payment, through 2003, of an additional $24,393,347 in federal income taxes, along with $5,311,250 in underpayment interest, and $120,905 in federal environmental taxes. These figures were calculated using a "with and without" methodology, which is to say, actual taxes paid for those years in light of Guarini versus taxes that would have been paid if Guarini had not gone into effect. TIN also seeks the court's endorsement of a figure for net lost Minimum Tax Credit ("MTC") carryforwards that would have been generated as of the end of 2003 of $120,978,072. TIN also seeks an upward adjustment of the ultimate award to reflect its assumption that an award would be subject to income tax.

The government raises few factual disagreements with the numbers proffered by TIN's motion. They will be discussed below. The government did not cross move. The issues have been fully briefed. Oral argument was held on July 20, 2005. Plaintiffs subsequently notified the court of the opinion of the Federal Circuit in *First Heights Bank v. United States,* 422 F.3d 1311 (Fed.Cir. 2005) (affirming *First Heights v. United States,* 57 Fed.Cl. 162 (2003)), which it suggested was directly relevant to the issues here. Defendant has responded to that notice, contending that *First Heights* can be distinguished. For the reasons set out below, we grant partial summary judgment to plaintiffs.

## BACKGROUND

Familiarity with the general background found in our prior opinion is assumed. The facts pertinent to the issues before us are outlined below.

In 1987 and 1988, TIN, in conjunction with two other companies, ("Temple Group") sought to acquire one or more failing thrifts in an FSLIC-assisted transaction. Temple

Group members agreed that the transaction would be structured to assure that the new thrift would be a member of the group for federal income tax purposes. On September 30, 1988, the Temple Group entered into an Assistance Agreement with FSLIC. Under that Agreement, Temple Group acquired substantially all of the assets and liabilities of three failing thrifts: GFSB; First Federal Savings and Loan Association; and Delta Savings Association. GFSB was chartered and organized as the surviving thrift of the acquisition.

FSLIC agreed to compensate GFSB for every Covered Asset sold at a loss. The Assistance Agreement defined Covered Assets as the assets of the three insolvent thrifts. A CAL was equal to the amount "by which the Book Value of a Covered Asset exceeds the . . . Net Proceeds Received by [GFSB] upon the Liquidation of such Covered Asset," or any write-down or negative adjustment to the Book Value of a Covered Asset as directed or approved by FSLIC. Pursuant to section 3 of the Agreement, GFSB would debit "Special Reserve Account I" ("SRA I") the amount of its CALs. Section 9 of the Agreement, titled "Tax Benefits," provided that at the end of five years, GFSB would credit or debit the SRA I in accordance with that provision and share 25% of the tax benefits with FSLIC. The Agreement further provided that GFSB would file its tax returns "in such a manner as to maximize any tax benefits arising from the nature or treatment of assistance from [FSLIC] under [the Assistance Agreement]." Finally, section 31 of the Agreement provided that the parties would "in good faith, and with their best efforts, cooperate with one another to carry out the purpose of th[e] Agreement."

In addition to the reimbursement of GFSB's CALs, TIN was free to enjoy the tax benefits available to the FSLIC-assisted acquirers of failing thrifts. Three provisions of the Internal Revenue Code provided these benefits. Under section 368(a)(1)(G) of 26 U.S.C. (the "Code"), as it then read, TIN could recognize a tax loss upon the disposition of a Covered Asset with a tax basis greater than its fair market value. Section 382 of the Code enabled TIN to carryover the net operating losses ("NOL") of the acquired thrifts in order to offset post-acquisition taxable income. Finally, section 597 of the Code enabled TIN to avoid counting the CAL reimbursements as taxable income.

After the acquisition, GFSB and TIN undertook to determine any differences in the book and tax basis of Covered Assets acquired from GFSB and First Federal. GFSB and TIN were able to determine a book and tax basis for all acquired Covered Assets, and thereafter, tracked differences. Defendant's expert, Mr. William F. Wolf, who has prepared an extensive expert report in response to TIN's damage request, no longer challenges TIN's figures with respect to the tax basis of Covered Assets.

TIN utilized the CAL deduction in filing its tax returns for years 1988 through 1992, as it was permitted to do at the time, despite the receipt of FSLIC assistance payments with respect to such losses. TIN's initial return for taxable year 1991 reported an alternative minimum tax ("AMT") NOL, which it elected to carry back to taxable year 1988, resulting in a refund of AMT for 1988. In 1993, however, Congress passed the Guarini legislation which retroactively eliminated the CAL deduction back to March 4, 1991.[1] Once Congress enacted the Guarini legislation, TIN had to amend its 1991 and 1992 returns and pay additional tax and interest to reflect the change in the law. With respect to years 1991–2001, after adjusting for Mr. Wolf's calculations, TIN paid a total of $32,524,462 in additional tax, along with interest in the amount of $5,311,250. Because amendment of the 1991 return resulted in elimination of AMT NOLs, TIN also had to amend its 1988 return to eliminate the NOL carryback.

The IRS has completed audits of TIN's consolidated tax returns through 2000. In October 1999, TIN and the IRS executed a closing agreement ("Closing Agreement I") covering years 1987–1992. In November 2002, TIN and the IRS executed a closing agreement covering 1993–1996 ("Closing

---

1. Defendant correctly points out that a similar piece of legislation adopted in 1992 was vetoed.

Agreement II"). These agreements included agreed-upon figures for the thrift's bad debt computation through 1995, as well as bad debt reserve balances which would be recaptured as income ratably between 1996 and 2001. TIN's damage calculations use the bad debt calculations emerging from these audits and accompanying amended returns as a baseline for determining the amount of lost CAL deductions. They were prepared by Brian Pasher, Assistant Treasurer and Tax Director for TIN.

It is undisputed that the IRS's audits of TIN's consolidated tax returns for the taxable years 1987 through 1992 included many inquiries into areas directly implicating the tax basis of Covered Assets. Under Closing Agreement I, TIN was permitted to take pre-Guarini CAL deductions, based on work papers for 1991 and 1992. For 1993 through 1995, TIN's calculation began from the tax return work papers, which reflected the changes brought about by Guarini. These were updated after the IRS audit adjustments. With respect to bad debt deductions, removing the Guarini effect was relatively straight forward-deleting the reduction in losses or write-down for the amount of capital loss coverage. Losses other than bad debt deductions, a relatively much smaller figure, were reflected in the various returns and were not altered by the closing agreements. After minor corrections in light of defendant's expert's critique, TIN advances a figure of $555,791,213 in lost CAL deductions. With the exception of the arguments addressed below, this figure is not materially disputed by defendant.

Based on the $555,791,213 figure for lost CAL deductions, plaintiff's damage claim then applies a 35% effective tax rate (not disputed) and a 25% discount to reflect FDIC's[2] share of the tax savings (also not disputed). The result is $145,895,193 in net lost tax benefits. Of this amount, $24,393,347 represents the net loss to TIN through 2003, after removing the 25% share to the FDIC, and as adjusted by concessions to corrections offered by Mr. Wolfe.

With respect to the $120,978,072 figure for lost MTC carryforwards, TIN's projected damages utilize a different calculation, which is complicated by two factors. The first is that TIN has been subject to the AMT calculation throughout the period in question. The second is the adjustment for current earnings ("ACE"). Fortunately, the parties understand and agree in substance on the mechanics of these adjustments to regular tax liability. The confluence of these adjustments creates the possibility (in TIN's case the reality) that the taxpayer, by paying AMT instead of tax at regular rates, earns MTC carryforwards, which constitute the payment of AMT in excess of regular tax liability. These MTC carryforwards can be used in later years to reduce regular tax liability dollar-for-dollar. Post–Guarini, TIN had $93,643,000 in MTC going forward from 2003. It contends that, but for Guarini, it would have had an additional $161,304,097 in credits. Reduced for FDIC's share, the figure claimed is $120,978,072. This difference in MTC carryforwards constitutes the only damages TIN asserts as a post 2003 lingering effect of Guarini.

TIN paid the FDIC the 25% share of tax benefits to which the FDIC was entitled under Section 9 of the Agreement through 1993, and then paid the FDIC for FDIC's further and future share of tax benefits in connection with the GFSB Tax Agreement, executed in connection with a 1995 Termination Agreement with the FDIC. The agreement preserved, however, TIN's right to bring the instant lawsuit.

## DISCUSSION

### Disallowed CAL Deductions

The current motion seeks adjudication of the asserted loss of $555,791,213 in taxable income deductions. The government will not agree to that figure, primarily because it asserts that TIN could have avoided the loss of at least $181.5 million of the amount disal-

---

**2.** The Financial Institutions Reform, Recovery, and Enforcement Act abolished FSLIC and FHLBB. Pub.L. 101–73, 103 Stat 183 (1989). It transferred their functions to the FDIC and three new institutions: the Resolution Trust Corporation, the Office of Thrift Supervision, and the Federal Housing Finance Board.

lowed by accelerating deductions and amending its pre-Guarini tax returns.

■ The government characterizes its argument as a challenge to plaintiffs' proof of causation. We have rejected this characterization before, *see, e.g., National Austl. Bank,* 63 Fed.Cl. at 360; *First Nationwide Bank v. United States,* 56 Fed.Cl. 438, 444 (2003), and it was conclusively rejected in the recent affirmance in *First Heights Bank, FSB,* 422 F.3d 1311, 1317 (Fed.Cir.2005). The argument is properly characterized as a question of mitigation, as to which the government bears the burden of proof. *Id.; see also First Nationwide,* 56 Fed.Cl. at 444; *Brazos Elec. Power Coop., Inc. v. United States,* 52 Fed.Cl. 121, 128 (2002). The non-breaching party is only required to take reasonable steps to mitigate—it need not take all action possible to avoid damages. *See First Nationwide,* 56 Fed.Cl. at 444; *Koby v. United States,* 53 Fed.Cl. 493, 496–97 (2002). According to the Federal Circuit:

> The law requires that the non-breaching party make only "those efforts that are fair and reasonable under the circumstances." *Home Sav. of Am., FSB v. United States,* 399 F.3d 1341, 1353 (Fed.Cir.2005) (internal quotation omitted). To support its mitigation argument, the government relies solely on its assertion that "nothing prevented" plaintiffs from taking the additional charge-offs prior to the effective date of the Guarini Amendment. The mere assertion that mitigation was possible, however, does not raise a triable issue of fact because it does not address the reasonability of the actions actually taken.

*First Heights,* 422 F.3d at 1316. The court concluded that the bank's actions there in response to Guarini were not unreasonable. The additional $32.7 million in charge-offs were minor compared to the amount of successful acceleration the bank was able to achieve after Guarini. In addition, the court endorsed the trial court's views that further acceleration ran the risk of IRS scrutiny and audit and that the government's criticisms of how the bank conducted its business affairs were too imprecise to raise a fact question.

■ The facts of *First Heights* are somewhat distinct. It is not the case here that the alleged lack of mitigation is minor, particularly because there is no successful mitigation with which to contrast it. Other distinctions, however, run in TIN's favor.

The precise mechanics of the alleged missed opportunity for taking deductions here are difficult to follow. It is worth noting, however, that they are materially more problematic for the government than those at issue in *First Heights,* although the fact that the publicly-released trial opinion in that case is redacted in this respect makes that fact less than apparent. Without disclosing those redactions, it is sufficient to say that the method of alleged potential acceleration in *First Heights* had in fact been used by the bank and the bank did not question the theoretical legal availability of the deduction with respect to pre-Guarini charge-offs which it had already recognized. We simply declined to penalize the bank for not aggressively pursuing the last degree of potential acceleration. The bank had succeeded in substantially mitigating damage, and further acceleration may have invited IRS scrutiny.

The present allegation by defendant is very different. Here, defendant is. challenging the failure, post-Guarini, to retroactively take previously unrecognized charge-offs for pre-Guarini years, when those charge-offs would generate new pre-Guarini NOLs which could not be fully absorbed in those pre-Guarini years. In short, unlike *First Heights,* defendant's argument here depends, at bottom, on a highly problematic interpretation of the Guarini legislation.

Defendant contends that, despite the outwardly draconian appearance of that legislation, concealed within the effective date provisions was an "out" for an observant taxpayer. We quote below the relevant portion of Section 13224. We leave the emphasis where it was added in defendant's brief:

(c) EFFECTIVE DATE.—

(1) IN GENERAL.—Except as otherwise provided in this subsection—

    (A) The provisions of this section shall apply to taxable years ending on or after March 4, 1991, but only with respect to

FSLIC assistance not credited before March 4, 1991.

(B) If any FSLIC assistance *not* credited *before March 4, 1991,* is *with respect to* a loss sustained or *charge-off in a taxable year ending before March 4, 1991,* for purposes of determining the amount of any net operating loss *carryover* to a taxable year ending *on or after March 4, 1991,* the provisions of this section shall apply to such assistance for purposes of determining the amount of net operating loss for the taxable year in which such loss was sustained or debt written off. *Except as provided in the preceding sentence, this section shall not apply to any FSLIC assistance with respect to a loss sustained or charge-off in a taxable year ending before March 4, 1991.*

The last sentence of sub-paragraph (B), particularly when combined with sub-paragraph (A), makes it clear that Guarini presumptively applies only for taxable years after March 4, 1991, and then only with respect to assistance credited after that date. Plaintiff concedes the argument thus far. Indeed this phenomenon is the one relied on by the bank in *First Heights* to the extent it successfully accelerated. There is a condition to the non-application of Guarini, however, spelled out in the first sentence of sub-paragraph (B). When FSLIC assistance credited after March 4, 1991, is prompted by a pre-Guarini charge-off, then the deduction disappears to the extent *"any"* NOLs are carried forward into the post Guarini taxable years. The parties refer to this as the Guarini NOL Cut–Back Rule.

It is undisputed that TIN already had over $90 million in unabsorbed NOLs that it brought forward into 1992. It is also not disputed that TIN filed its tax returns on the assumption that it could not accelerate charge-offs into pre-Guarini tax years because there were already too many unabsorbed NOLs coming forward from the three years prior to 1992. It assumed that adding additional losses into those three years would not succeed in avoiding the language quoted above, because the net effect was to increase NOLs brought forward into post-Guarini tax years.

Defendant's expert's argument, however, rests on the contention that the phrase "any net operating loss" in sub-paragraph (B) is not implicated if it can be argued that only non-CAL generated NOLs are brought beyond 1991. In that circumstance, according to the defendant, the last sentence of sub-paragraph (B) is an escape route that TIN failed, foolishly, to utilize. According to defendant, sub-paragraph (B) permits the continued use of the deduction, even if the deduction or charge-off was reimbursed after March 4, 1991, so long as the deduction or charge-off was carried back to a pre-Guarini taxable year, and if the resulting CAL-based NOLs were completely absorbed prior to March 4, 1991.

We make a couple of opening, general observations about Mr. Wolf's theory. The first is that the argument is peculiar, given the government's consistent position in these Guarini-related cases. The government has argued, even in this case,[3] that there were no CAL deductions available *at all,* when thrifts received reimbursement for losses. I.e., that Guarini was merely a clarification of a prior fact-namely, the non-existence of the deduction. It is remarkable that the government now takes the position that, not only did the deduction in fact exist, but apparently, unbeknownst to TIN, the legislation contains its own "DaVinci Code" by which a bank could get around some of the effects of Guarini. This contention is doubly bizarre, given the apparent impatience of the legislative sponsors with the "double dip" permitted by the tax law. *See Centex Corp. v. United States,* 395 F.3d 1283, 1302–06, 1308–09 (Fed.Cir. 2005).

The second reason is that, as TIN points out, this "mitigation" in fact turns out to be no mitigation at all, because, if the bank could have foreseen Mr. Wolf's advice and successfully accelerated the deductions, the government would have lost the money the bank now seeks to recover. The government, in short, would not have benefitted from the maneuver, a requisite to a mitigation claim. It is only now, after it is too late

---

**3.** *See, e.g.,* defendant's responses to plaintiff's proposed findings of fact para. 35 and 72.

to reopen the tax returns, that the government is in a position to take advantage of the asserted failure to mitigate.

A final general observation is that, as we explain below, Mr. Wolf's suggested dodge around Guarini is creative and complicated. It is simply too much to assume, given the fact that the burden of proof is on defendant on this issue and in view of TIN's continuing subjection to ongoing audits by the IRS of the original returns, that in the midst of those audits, the IRS would have blandly accepted, without protest, amended returns claiming massive new deductions.

The details of Mr. Wolf's argument are no more persuasive. As we explain above, he makes the argument that the Guarini legislation would permit accelerating $181.5 million in CAL charge-offs backward into pre-Guarini years in such a way that they would free up an equivalent amount of non-CAL NOLs which could then be moved into post-Guarini years. According to Mr. Wolf, even if additional NOLs are carried forward into post-Guarini years, the legislation does not preclude their retention, so long as the CALs recognized are fully absorbed in tax years prior to Guarini, and that the NOLs moving "across the line" into 1991 are not related to CALs.

As plaintiff points out, this scheme requires reading out the word "any" in subparagraph (B): "for purposes of determining the amount of *any* net operating loss carryover to a taxable year ending on or after March 4, 1991." Section 13224. Plaintiff suggests that the word "any" means any; i.e., *any* NOL, even those unrelated to CALs, so long as the effort to claim them is triggered by moving CALs into those earlier taxable years. Thus, if accelerating CAL charge-offs into early years were even possible (i.e., if there were sufficient income to offset and the charge-offs were "ripe"), the taxpayer would have to trust that the IRS agreed that neither the letter nor the spirit of Guarini were offended by substituting CAL deductions for non-CAL deductions and thereby freeing up NOLs in the earlier years.

The government's reliance on legislative history supporting its view is misplaced. It points to the House Committee Report to Guarini in which the following example appears: "[A]ssume that the net operating loss described in the example ... were carried back to, and absorbed in, an earlier year ending prior to March 4, 1991 (rather than being carried forward). In that case, the provision would not apply to reduce the net operating loss carryback." H.R.Rep. No. 103–111, pt. 6, at 48 (1993), U.S.Code Cong. & Admin.News 1993, pp. 378, 903. It is puzzling to the court why the government would rely on this example. The net operating loss referred to in the example was generated by a write-down (approved by FSLIC) in 1990. Mr. Wolf's mitigation model, on the contrary, attempts to take post-Guarini approved and reimbursed write-downs and force them into an earlier year. Moreover, in the example, the NOL was "absorbed" in that earlier year. In the present circumstances, the NOL could not be absorbed. Indeed, as TIN points out, the Treasury Department's Tax Legislative Counsel, Terrill A. Hyde, testified that "[W]e believe March 4, 1991 is the more appropriate [effective] date.... This eliminates the incentive institutions might otherwise have to avoid the proposal by claiming write-downs in earlier years through amended returns or otherwise. It also minimizes uncertainties as to which losses are subject to the provision." *Tax Aspects of Government–Assisted Savings and Loan Acquisitions: Hearing on H.R. 1135, H.R. 1338, H.R. 1326, and H.R. 561 Before the H. Comm. On Ways & Means,* 102d Cong. 39 (1992) (statement of Terrill A. Hyde, Tax Legislative Counsel, United Stated Department of the Treasury).

In any event, we do not need to resolve the statutory interpretation question raised. It is sufficient to observe that a more facially plausible reading of the phrase, "the amount of any net operating loss carryover" is directed at any increase in NOLs prompted by the carryback, irrespective of the source, so long as the increased amount has its origin in CAL deductions, as they plainly would have here. The government has the burden of proving that the failure to accelerate was unreasonable. Given the aggressive construction this would require of Guarini, and the fact that the IRS was already in the

midst of auditing TIN, defendant has not met its burden of demonstrating that the taxpayer was unreasonable in not taking this position.

There are other problems with the government's position. As TIN points out, the bank was already bringing more than $90 million in NOLs forward from 1990 because it had exhausted its ability to absorb those losses in earlier years. It had no choice but to move them beyond 1991. Mr. Wolf's model assumes that $181 million in additional charge-offs could be carried backwards into pre-Guarini taxable years and either fully absorbed (which was not possible, given the lack of offsetting income), or substituted for other NOLs which would be carried into 1991 and beyond.

Other practical difficulties abound. It is undisputed that, given the peculiar effects of AMT rates to which TIN was subject at the time, even if TIN could have accelerated $181.5 in additional charge-offs, the short term effect would have been to create an additional AMT liability of $8 million. In addition, Covered Assets could only be charged off if they were shown to be at least partially worthless. It is undisputed that TIN, in a valid exercise of its own business judgment, made it a practice not to take a tax charge-off until after FSLIC/FDIC approved or directed either the CAL's sale or write-down because doing so created a conclusive presumption of worthlessness. *See* Treasury Regulation § 1.166–2(d)(1). The accelerated charge-off of a CAL, on the other hand, would have required TIN to be able to substantiate its partial worthlessness claim with a contemporaneous appraisal. According to Treas. Reg. § 1.166–3(a)(2)(iii) (2005), before a taxpayer may take a tax charge-off for a worthless asset, it must "demonstrate ... the part thereof which has been charged off [i.e., on the company's own books]." TIN argues that this regulation requires an asset to be charged off the taxpayer's books before it may be taken as a tax charge-off. The Guarini legislation neither affirms nor eliminates the book charge-off requirement. It is

undisputed, however, that the assets in question had not yet been charged off.[4] It would have been inconsistent, therefore, with TIN's prior practice, and probably a disputed legal point at best, if it had *sua sponte* initiated a charge-off without first getting agency approval or direction for a write-down.

The duty to mitigate does not include the duty to face legal action. *See, e.g., Davies v. Krasna,* 14 Cal.3d 502, 121 Cal.Rptr. 705, 535 P.2d 1161, 1170 (1975) ("[T]his principle[, mitigation,] does not require injured parties to take expensive and burdensome steps to minimize their losses, and certainly legal action is not typical of the kinds of behavior which courts expect of such victims.") (citation omitted); *W. Pinal Family Health Ctr. v. McBryde,* 162 Ariz. 546, 785 P.2d 66, 69 (1990). In sum we reject the government's argument that TIN failed to mitigate when it did not attempt to accelerate $181 million in CAL deductions.

*Intercompany Advances*

■ A more particularized aspect of the government's challenge to proof of causation relates to the write off of intercompany loans. Mr. Wolf contends that proper tax treatment of these loans would eliminate approximately $150 million from the $556 million figure, reducing damages by $52.3 million. These bad debt losses in 1991 and 1992 were from loans between Guaranty and its subsidiaries. Mr. Wolf's argument appears to have become more focused throughout the discovery period, but it depends on the key assertion that TIN and its subsidiaries improperly applied Treasury Department regulations concerning the attribution of income when debt is cancelled in a consolidated company setting. Under 26 U.S.C. § 61(a)(12), discharge of a debt is taxable as income to the debtor, in this case, the subsidiaries. When the debtor is insolvent, 26 U.S.C. § 108(b) requires that certain tax attributes, such as NOLs, or MTCs, be offset instead, so that the income can, in effect, be deferred.

TIN reported taxes on a consolidated basis, as it had a right to do. Consequently, in calculating damages, it based its with and

4. Although the assets of the three predecessor thrifts were charged-off their own books prior to their acquisition by TIN, the government concedes that these charge-offs were reversed after the thrifts were acquired by the Temple Group.

without Guarini analysis on the returns actually filed by the thrift, and as subject to the closing agreements with the IRS. Mr. Wolf takes the position that it should make no difference if the parent lost, due to Guarini, the ability to claim a deduction for loans to the subsidiary that were canceled because the loss and income from the canceled debt would create a "wash" effect within the consolidated group and there would thus be no deduction needed. Mr. Wolf believes that in 1991 and 1992, the tax law would have required income attribution to include all such attributes available to the consolidated group, not just those of the subsidiary debtor: "The tax law requires the reduction of the consolidated NOL when attributes are reduced ...." Revised Expert Report of William W. Wolf, p. 33.

Mr. Wolf cannot point to any explicit language in a statute or regulation in effect prior to 2003 which supports his position. The IRS adopted regulations in 2003, which, if in effect in 1991 and 1992, apparently would have led to consolidated tax attribute reduction. See T.D. 9089, Treas. Dec. Int. Rev. 9089 (2003). They only apply, however, as he concedes, to COD realized after August 29, 2003. Mr. Wolf believes that the IRS would have taken the same position in 1999, when the closing agreement covering these years was executed, or, at least that it should have. The problem he has, however, is that the IRS apparently did consider the question in connection with the closing agreement with TIN which covered 1991 and 1992. It did not in fact require such income attribution. Indeed, the agreement is very specific with respect to treatment of income attribution. The subsidiaries are required to treat debt cancellation as income, and attribution is limited to the insolvent subsidiaries. The IRS was content, in other words, to treat subsidiaries as the "taxpayer" with respect to Section 108.

We deem it unnecessary to determine whether the 2003 regulation merely discover-

ed the correct state of the law or in fact created new law.[5] TIN is entitled to base its present claim on the state of its closed tax returns. It is entitled at this point to a heavy presumption of correctness. We cannot, of course, require the actual filing of amended returns. Instead, following the government's suggestion in this one respect would require the creation of a purely fictional tax treatment. In effect, we would be basing a ruling on the creation of an artificial dual reality, without permitting any consideration of the collateral consequences at the time, or later, of ignoring the closing agreement. TIN is an ongoing entity. It is entitled to present its claim on the assumption that the closing agreement is final, and that another executive agency, in this case the Department of Justice, will not attempt to unscramble it.

*Remaining Challenges to the $556 Million Figure*

The government raises two other specific arguments concerning calculation of the $556 million figure. The first concerns transactions related to property in Travis County, Texas. The government argues that those losses, which are imbedded in TIN's closed 1992 tax return, should not be reimbursed by FDIC. Therefore, their value should be eliminated from the $556 million. It is uncontested that a bookkeeping error in the 1992 return turned what should have been reported as a $999,647 gain on the Travis County assets into an equivalent loss. The total error amounts to nearly $2 million in underreported income. TIN does not dispute these facts. The government asserts, however, that the error is being compounded in TIN's current damages claim.

TIN has two responses. The first is that the 1992 tax year is a closed event. The IRS approved its treatment of the Travis County assets for tax purposes. The closing agreement for that year cannot be reopened in collateral litigation. We agree with that po-

5. Mr. Wolf relies on *United Dominion Industries, Inc. v. United States*, 532 U.S. 822, 121 S.Ct. 1934, 150 L.Ed.2d 45 (2001). It was indeed cited by the IRS in adopting the 2003 change in regulations. See 68 Fed.Reg. 52487 (Sept. 4, 2003). It was merely referred to as relevant, however, and not as having previously announced the change. Indeed, *United Dominion* dealt with the carryback period for product liability losses under section 172(b) and has nothing to do with Section 108.

sition, although we find TIN's second argument more relevant. TIN contends, and the government has been unable to demonstrate to the contrary, that plaintiffs' "with and without" damages model makes the error irrelevant. The error appears on both ends of the calculation, cancelling itself out. TIN is only claiming *net* lost deductions. To the extent that TIN benefitted from the error originally, by claiming a deduction where one did not exist, it is not claiming damages today.

In addition, the government is, in effect, critiquing the allowance of the deduction with respect to the closed 1992 return. Our charter in a contract case does not run to correcting closed tax returns. As we are satisfied that the current CAL figure does not include the Travis County loss, we do not make any adjustment on this account.

The government's second challenge relates to certain assets which TIN sold to the FDIC as part of the 1995 Termination Agreement. Mr. Wolf contends that a portion of two types of sales, one of Covered Assets, another of covered subsidiaries, was incorrectly characterized in TIN's damage calculations as loss reimbursements under section 3(a)(1) of the Assistance Agreement. The government argues that these asserted losses should be treated instead as a Covered Asset purchase by the FDIC pursuant to Section 19 of the Assistance Agreement. It points to TIN's 1999 closing agreement with the IRS, in which it represented that "payments received by [the thrift] pursuant to section 3(a)(1) (but not payments received pursuant to other sections) of the Assistance Agreement after March 4, 1991, will be taken into account under section 13222(a) of the Revenue Reconciliation Act of 1993." The net effect was that only losses under section 3(a)(1) would be subject to Guarini. In addition, Mr. Wolf questions TIN's treatment in its damage claim of FDIC payments for purchase of covered subsidiaries. The questioned amounts total approximately $4.4 million.

TIN counters that its treatment of the sale proceeds as reimbursement complied with the Assistance Agreement, conformed with its past practice, and withstood IRS scrutiny. Furthermore, it contends, the government's witness, Mr. Wolf, made concessions that implicitly validate TIN's reading of the Assistance Agreement.

The parties' disagreement concerns, in part, the application of the Termination Agreement and the Assistance Agreement. In theory, it should therefore be subject to summary disposition. Unfortunately, the issue is sufficiently complex, both factually and legally, that we are reluctant to deal with it without further exposition. The briefing on the issue is sparse. Although, if fully explained, the matter might be subject to treatment as a pure question of law, we decline, for the time being, to rule. Absent some additional effort at motion practice, we will reserve it for trial.

*Environmental Tax*

Up until 1995, TIN was subject to an environmental tax, pursuant to 26 U.S.C. § 59A. The tax was equal to .12% multiplied against TIN's alternative minimum tax income ("AMTI"). The tax was deductible against regular income. Because TIN's AMTI was generally lower prior to the adoption of Guarini, it lost a proportionate deduction to the extent of the impact of the Guarini legislation prior to 1995. The government does not dispute TIN's calculation of the amount of the lost deduction, net of FDIC's share, as $120,905.[6] We therefore adopt that figure.

*Underpayment Interest*

As stated earlier, Guarini prompted TIN to amend its tax returns for 1991 and 1992, resulting in the payment of additional tax for those years, as well as $5,311,250 in underpayment interest. Defendant does not dispute the amount of underpayment,[7] however, Mr. Wolf proposes a reduction of approximately $2 million, on the ground that TIN unnecessarily delayed, by six months, in the filing of its 1994 amended tax return. In his

---

6. Defendant does challenge the figure to the extent of its argument, rejected above, concerning mitigation.

7. Once again, with the exception of amounts related to the government's rejected mitigation argument.

judgment, TIN could have completed the necessary calculations more promptly. We reject the suggestion. At the time the returns were filed, it would have been obvious that delay would increase the amount of interest owed. Banks are not eleemosynary institutions and can be presumed to act in their own financial best interest. We have no basis for assuming, when the return was timely filed in March 1994, that TIN was acting in a negligent manner or was delaying in hopes of shifting later any interest expense to the government.

*Whether Interest Should Have Been Paid to the FDIC*

The government makes the argument that, if TIN succeeds in recovering lost tax benefits here, even if they are net of the 25% that would have been paid to the FDIC, then TIN owes the FDIC interest on the 25% portion that the agency would have received. The government is referring to the Assistance Agreement, which permitted the bank to hold tax benefits, although only by paying interest. As the government's own brief makes clear, the predicate for the argument is missing: "[I]f TIN had received its claimed but-for Guarini tax benefits, and been able to realize them, TIN would have to pay the FDIC not only its 25 percent share, but also an interest credit." Defendant's Opposition to Plaintiffs' Motion for Partial Summary Judgment as to Damages at 38. Considering that it was the United States that prompted TIN's inability to share tax benefits with the FDIC, the claim is peculiar. It is not as if the bank had withheld the FDIC's share for the past thirteen years and should be charged with the imputed value of that money. We reject the argument.

*Gross-up for Taxes*

Plaintiff argues that its award needs to be "grossed up" to account for the income taxes that they might have to pay as a result of this judgment. For the reasons articulated in *Centex Corp. v. United States,* the award should not be subject to income tax and thus will not be grossed up. *Centex,* 55 Fed.Cl. 381 at 389 (2003), *aff'd,* 395 F.3d 1283 (2005) ("[T]he entire point of the breach claim is that the judgment represents tax or penalties that, but for the breach of contract, would not have been paid.... It follows that an award from this court to compensate plaintiffs for the loss of that money is not subject to income tax.").

## CONCLUSION

Plaintiff's motion for partial summary judgment is granted with the exception of the issues of section 3(a)(1) loss reimbursements and tax gross-up. The parties are directed to file a joint status report on or before Wednesday, November 30, 2005, proposing further pre-trial proceedings consistent with this opinion.